## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| In re Duane D. Hansen | ) | Bankruptcy No. 13-81444 |
| | ) | |
| Debtor. | ) | Adversary No. 14-96025 |
| | ) | |
| Eastern Savings Bank, FSB, | ) | Chapter 7 |
| Plaintiff, | ) | |
| v. | ) | Judge Lynch |
| | ) | |
| Duane D. Hansen, | ) | |
| Defendant | ) | |

### MEMORANDUM OPINION

The Plaintiff Eastern Savings Bank, FSB brings the adversary proceeding to object to Dr. Duane D. Hansen receiving a discharge and for a determination that its debt is non-dischargeable.  For the reasons discussed below, after trial on the matter the Court grants judgment in favor of the Plaintiff and against the Debtor on Counts I and IV of its Amended Adversary Complaint and denies the Debtor discharge under 11 U.S.C. § 727.  The Court grants judgment in favor of the Debtor on the remaining Counts II, III and V.

### FINDINGS OF FACT[1]

*Procedural History*.

Debtor Duane Hansen filed his petition for relief under Chapter 7 through attorney John Gierum on April 23, 2013.  With his petition he initially filed only

---

[1] The following sets forth this Court's findings of fact as required by Fed. R. Bankr. P. 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

partial Schedules E and F, listing names of creditors but not the corresponding amounts of any claims. On May 3, 2013, he filed his Statement of Financial Affairs, the remainder of his schedules and amended Schedules E and F (adding the values of claims as well as additional claims). The Debtor also filed then his signed declaration declaring under penalty of perjury that he had reviewed his schedules and the information therein is true and correct. The Debtor testified at his meeting of creditors on May 30, 2013 and the Chapter 7 Trustee filed a no-asset report on June 24, 2013. The Debtor has not subsequently amended his schedules.

Within the time permitted to object, creditor, Eastern Savings Bank, who the Debtor scheduled as having a claim of $3,951,520 on a judgment against him, filed this Adversary Complaint. The Debtor changed attorneys and his new counsel filed the Debtor's answer to the complaint on May 28, 2014. The Plaintiff amended its complaint on September 2, 2015, which the Debtor also answered.

The Bank asserts five counts in its amended complaint. Count I seeks to deny the discharge under Section 727(a)(4)(A) alleging the Debtor: (i) understated his income, the income of his spouse and his business expenses in his schedules and testimony at the 341 meeting; (ii) failed to schedule or disclose at the 341 meeting his interest in Manatee Bay Restaurant, Inc. and his interest in its insurance policy and claims for losses incurred in relation to that business, his interest in the business Hansen and Hansen DDS, Ltd. and a 1970 Piper PA32-260 airplane registered in the corporation's name, and his interest in a 1990 Cadillac limousine, a Toyota Prius and real estate in Hanover Park and Lansing, Illinois; and (iii) for his failure to disclose

the transfer of the Hanover Park real estate to his ex-wife Kathleen Hansen pursuant to a judgment of dissolution of marriage. Count II seeks to deny his discharge under Section 727(a)(5) for failure to explain satisfactorily the loss of assets including fixtures, equipment and other property at the Manatee Bay Restaurant. Count III asks the court to find that the Bank's debt is non-dischargeable under Section 523(a)(6) because the Debtor removed property at the Manatee Bay Restaurant in which the Plaintiff had a security interest, allowed others to remove the property, or because he failed to name the Plaintiff as the loss payee in the insurance policy for the property. Count IV seeks to deny the Debtor a discharge for failing to disclose his interest in an airport hangar at the Rockford International Airport and his interest in a 2011 Hyundai Elantra in a pre-petition state court citation proceeding to enforce the Plaintiff's judgment pursuant to Section 727(a)(2). Count V seeks to except the debt owed to the Bank pursuant to Section 523(a)(2)(B) because at the time the Debtor applied for the loan from the Plaintiff he failed to list his interest in the Piper airplane or the Cadillac limousine in the loan application.

The Plaintiff sought summary judgment on all five counts which this Court denied for the reasons set forth in the order and statement entered February 15, 2017. (ECF No. 134.) Principally, the Court found that the Plaintiff had failed to demonstrate that there was no genuine dispute that the alleged misstatements and omissions were knowing or intentional, that the Debtor's explanation of loss was implausible or insufficient, that the Plaintiff had relied on the alleged omissions in the loan application, and that the Debtor's failure to protect its interest in collateral

was more than mere negligence.

The parties have stipulated that their "respective Rule 56 statements, to the extent that they were not disputed, may stand as the parties' pretrial stipulated statement of facts." (ECF No. 135.) They further filed a stipulation of certain facts prior to trial. (ECF No. 138.) The Court held an evidentiary hearing on May 16, 2017, continued on June 1, 2017 and June 8, 2017, at which it received exhibits and heard the testimony of the Debtor, the Debtor's spouse as of the petition date Carmen Hansen, his previous spouse Kathleen Hansen's divorce attorney Kiley Whitty, general counsel for the Plaintiff Douglas Durkin, the Debtor's accountant John Ford and the Debtor's former bankruptcy attorney John Gierum. The parties each filed post-trial briefs and the Plaintiff filed a reply brief on August 25, 2017.

*Factual History.*

Duane D. Hansen has been a licensed dentist for approximately 30 years. Over the course of his career he has owned and operated several dental practices, including, recently, Dental Designers, LLC and Rock River Dental, LLC. From 1985 to 2012 he was married to Dr. Kathleen Hansen, also a dentist. For a period during their marriage the Hansens practiced dentistry together through Hansen and Hansen DDS, Ltd.

**The Dental Practice.** The last year in which Hansen and Hansen, D.D.S., Ltd. filed a tax return or generated income was 2010. The Illinois Secretary of State involuntarily dissolved the entity on January 8, 2010. However, according to an October 30, 2013 report, the Secretary of State has reinstated that entity. The report,

however, does not indicate when that occurred. (Pl. Ex. 20.) According to the records of the Secretary of State, the corporation changed its registered agent to Glenn Greenberg, the father of Carmen Hansen, the Debtor's spouse at the time of filing the petition, on May 16, 2013 – a little more than three weeks after the Debtor filed his bankruptcy petition.  The Debtor testified with little credibility that he maintained the existence of the entity "for a fly-in dentistry program that I wanted to start," but admitted that he never actually instituted any kind of fly-in dentistry program through the entity. (Tr. May 16, 2017 20:5-13.)  Duane Hansen also testified that Hansen and Hansen "last[ed] as an active dental umbrella [p]robably until 2012." However, the Debtor's accountant testified more credibly that "Hansen & Hansen was rolled into Rock River I believe in the year 2010" and that "by 2012 it was Rock River and Dental Designers were [sic] the only two legal entities." (June 6, 2017 Tr. 86:5-6; 100:1-2.)[2]

**Florida Restaurant and Properties.**  Sometime prior to 2006, the Debtor and Kathleen purchased a restaurant in Marathon, Florida.  At trial the Debtor could not recall which year they purchased the restaurant.  The Hansens operated the restaurant through a corporation named Manatee Bay Restaurant, Inc.  The Parties stipulated that the Debtor owns a 50% interest in that entity.[3] (Stipulation, ECF No.

---

[2] The Hansens' May 29, 2012 Default Judgment for Dissolution of Marriage permitted the Debtor to "retain sole and exclusive ownership" of RockRiver Dental, LLC and Dental Designers, LLC and permitted Kathleen to "retain sole and exclusive ownership" of Georgetown Dental LLC and Primecare Dental LLC, but makes no reference to Hansen and Hansen. (Pl.'s Ex. 19.)

[3] In Duane and Kathleen Hansen's prior Chapter 11 bankruptcy case filed in December 2010, they scheduled "Manatee Bay Restaurant" as owned jointly.  Additionally, in this bankruptcy case, the Debtor listed in his response to question 21 of his Statement of Financial Affairs – which asks for the

138.)    After the Hansens purchased the restaurant it underwent extensive renovations before opening for business sometime in 2006. The Debtor and Kathleen never personally operated the restaurant. Instead they hired a series of several managers to oversee daily operations. According to his testimony, the Debtor visited the restaurant between three to five times per year.

In addition to the real estate on which the restaurant was located, the Debtor and Kathleen jointly owned a condominium in Key Colony Beach, Florida, which they purchased in 2001 and two unimproved "channel lots" in Florida. They financed these purchases with mortgages in favor of Marine Bank of the Florida Keys. (Tr. June 8, 2017, 9:15-12:3).[4]

**The Financing Agreements with Eastern Savings Bank.** In 2006, the Debtor and Kathleen Hansen approached a loan broker seeking more than $3 million in additional financing. Although the Debtor testified that they sought the money to purchase a residence in North Barrington, Illinois (Tr. June 8, 2017, 12:14-13:11), the loan application he signed states that he and Kathleen had owned that residence since 2002 and that the purpose of the 2006 loan was to refinance existing indebtedness. (Pl. Ex. 21.) According to a Uniform Residential Loan Application dated February 15, 2006, which the Debtor and Kathleen signed,[5] the Hansens

---

equity owners of the debtor "[i]f the debtor is a corporation" – "Duane Hansen And Kathleen Hansen; Manatee Bay Rest., Inc.; 50/50."

[4] The Debtor's testimony was clear that the purchases of both condominiums and the two unimproved lots were financed through mortgages to the Marine Bank. He was not clear whether his investment in the restaurant was similarly financed.

[5] Included within Plaintiff's Group Exhibit 21 were copies of similar but undated and unsigned loan applications which lack foundation and are not relied upon by the Court.

sought to refinance an existing lien of $940,000 with a $3,200,000 thirty-year loan to be secured by a mortgage in their North Barrington residence.[6]  The application makes no reference to Eastern Savings Bank, instead only referencing Mark Zator of M3 Mortgage Specialists, Inc., who the Debtor testified was the couple's loan broker.

No evidence was presented to show that this document[7] was furnished to or relied upon by Eastern Savings Bank.  The only witness from the bank, Douglas Durkin, testified that he "first became involved in August of 2009 ... after the two foreclosure actions were filed, and once ... title issues arose." (Tr. June 1, 2017, 53:10-14.)  He further testified that he had "no personal knowledge about" the creation and origination of the Eastern Savings Bank loan to the Debtor, the only information he possessed being obtained "solely from documents." (Tr. June 1, 2017, 169:10-19.)[8]  Instead, the evidence shows that on April 18, 2006 the Debtor alone signed an "Application Agreement" with Eastern Savings Bank bearing the date of April 14, 2006.  By this agreement, Duane Hansen agreed to pay an application deposit of $5,000 for a mortgage loan in the amount of $3,600,000 to be secured by the North

---

[6] The schedule of real estate attached to that application suggests that the North Barrington residence was subject to mortgages of $922,291 to "WAMU" and $754,489 to Harris Bank. (*Id.*)

[7] Or the two undated, unsigned loan applications, which also made no reference to Eastern Savings Bank.

[8] While Mr. Durkin testified that he had reviewed the "loan file," no evidence was presented as to which if any of the loan application materials included in group Exhibit 21 were contained in that loan file or as to when or how they were made part of such loan file. Mr. Durkin testified that the unsigned, undated loan application for $3,400,000 was "the operative one for purposes of the residential loan," testifying that certain handwritten notes on that application were "the underwriter's handwriting." (Tr. June 1, 2017, 57:16-20.) Mr. Durkin provided no foundation for this conclusion, however, such as who that underwriter was, how he was able to recognize the handwriting, or when or how the notes were written onto the document – including whether they were written before or after the loan was made.

Barrington residence and the Florida restaurant, condominium and two unimproved lots. (Pl. Ex. 21.) Mr. Durkin testified that the Bank only required its two-page short form application agreement from the Debtor, rather than the longer Fannie Mae form loan application, because the final loan terms were "part commercial, part residential." (Tr. June 1, 2017, 178:2-5.)

On April 20, 2006, the Debtor and Kathleen Hansen signed two more Uniform Residential Loan Applications: one for a $1,825,000 30-year mortgage loan listing the Florida restaurant as the "Subject Property" and one for a $1,775,000 30-year mortgage loan whose "Subject Property" was the North Barrington residence. (Pl. Ex. 21.) Unlike the April 18 loan application which had listed Mark Zator of M3 Mortgage Specialists as the "Interviewer," the April 20 loan applications listed Don Bennett of Eastern Savings Bank as "Interviewer."[9]  The following day, Debtor and Kathleen Hansen signed $1,825,000 and $1,775,000 promissory notes in favor of Eastern Savings Bank.  They provided the lender a first mortgage, assignment of leases and rents and security agreements of the Florida restaurant property, condominium and two unimproved lots to secure the $1,825,000 note and a second mortgage in the same properties to secure the $1,775,000 note. (Pl. Ex. 27.)  Both mortgages refer to a mortgage of the North Barrington residence dated the same date as cross-collateralizing the two loans, but such mortgage was not offered in evidence at trial.

Each of the April 20, 2006 Uniform Residential Loan Applications contains a two-column section for listing the applicant's "assets and liabilities."  Under "assets,"

---

[9] While the February 15 loan application was signed by Mr. Zator, the April 20 loan applications merely have Mr. Bennett's name typed, leaving blank the spot for his signature.

the Hansens listed only $3,700,000 as "real estate owned," leaving blank spaces for "cash", "checking and savings accounts", "stocks & bonds", "automobiles owned" and "other assets." (Pl. Ex. 21.)   The application form does not provide directions regarding completing this section other than to indicate that joint-borrowers should include separate statements unless a joint statement "can be meaningfully and fairly presented on a combined basis." The application includes no statement or representation that the borrowers did not own any additional unlisted assets. Instead, each application ends with the simple representation that "the information provided in this application is true and correct." (*Id.*)

The weight of the evidence does not support the Bank's assertion that it relied on the disclosures listed in the "asset" column on page 2 of the application.  Even a cursory review of the applications by the Bank would have revealed the page 2 entries to be incomplete and inaccurate. The first page of the application states that both the Debtor and Kathleen Hansen are self-employed by and "Dentist/Owner" of Hansen & Hansen D.D.S., Ltd. and that the Debtor is self-employed by Manatee Bay Restaurant as "Restaurant Owner," clearly indicating that something must be missing from the list of holdings found on page 2.  Additionally, Mr. Durkin testified that the Bank did not rely upon the April 21 applications in making the loan decision.   Instead, according to the Bank's witness, the applications were "prepared for the bank's purposes to have the borrowers sign and restate as of the date of the closing the loan terms." (Tr. June 1, 2017, 55:19-56:2.)

The Debtor's April 18, 2016 Application Agreement does not contain

representations beyond describing the proposed loan as to be "secured by a first lien on [the North Barrington residence and the Florida condominium, restaurant and two empty lots.]"   As for the February 15, 2016 Uniform Residential Loan Applications and the two unsigned, undated Uniform Residential Loan Applications, the Bank failed to prove that the Bank relied upon them or even that it received them before making the loan.   To the contrary, Mr. Durkin testified that based on the information provided to the Bank, "we thought there was more than sufficient value for that loan." (Tr. June 1, 2017, 180:11-16.) The Plaintiff ignores its own witnesses' credible testimony on this point to make the speculative, *post hoc* argument in its post-trial brief that it would have *liked* to have had liens in the Cadillac, the 1970 Piper and the hangar had it known about them.   But the Bank fails to show that it would have *required* such additional collateral to be pledged.   This argument is flatly contradicted by Mr. Durkin's testimony about the sufficiency of the loan to value information given to it at the time and the uncontested facts about the Bank's willingness to grant the loan on that collateral alone.

**The Hansens' Chapter 11 Bankruptcy.**   On December 16, 2010, the Debtor and Kathleen Hansen filed a joint Chapter 11 petition in the Eastern Division of the Northern District of Illinois.   The initial skeletal filings were later supplemented with completed schedules that listed the Florida restaurant real estate, condominium and the two vacant lots as jointly owned and valued at $800,000 filed on January 2, 2011. (Pl. Ex. 26.)   The Hansens also scheduled as owned jointly in fee simple their North Barrington residence, scheduled as worth $1,200,000, commercial property in

Hanover Park ($150,000) and Lansing, Illinois ($50,000). These schedules disclosed a 2008 Mercedes-Benz M1320 CDI valued at $33,125 owned by Kathleen, a 2004 Jeep Carryall owned by the Debtor ($8,770) and a 2002 Chevrolet Cavalier owned jointly ($1,200). They also scheduled a 1990 Cadillac Brougham 4d worth $3,925, describing that vehicle as "Community" property. A certificate of title issued by the Illinois Secretary of State on March 10, 2009, shows that a 1990 Cadillac limousine was titled in the name of "Hansen & Hansen DDS, Ltd." when the Hansens filed their bankruptcy schedules in 2011. (Pl. Ex. 28.)

The Hansens also listed aircraft-related assets in their 2011 filings. They scheduled a 1970 Piper PA32-260 worth $30,000 as well as a 1976 Piper PA-31-350 Chieftain ($120,000), describing both airplanes to be owned jointly. (Schedules, Jan. 2, 2011, Case No. 10-B-55544, ECF No. 9) However, the Hansens' Schedule B states that the 1976 Piper is "owned by R&H Aviation Corp." and is not "personal property of debtor."[10] (*Id.*) At trial, Duane Hansen denied personally owning the 1970 Piper, identifying his defunct corporation Hansen & Hansen DDS, Ltd. to be its owner. (Tr. May 16, 2017, 89:4-9.) A Department of Transportation certificate of registration issued on September 17, 1998 to Hansen and Hansen DDS, Ltd., appears to corroborate this testimony. (Pl. Ex. 21.) On the other hand, an insurance policy that the Debtor obtained on the aircraft on or about September 11, 2013, lists the Debtor as the "Insured." The evidence adduced at trial further shows that as of the petition date, the Debtor used the airplane exclusively for his own personal benefit and held

---

[10] There is no such statement about the owner of the 1970 Piper.

it out to be his own. (Pl. Ex. 10A, Tr. May 16, 2017, 88:18-89:3.)

In the Schedule B filed by the Hansens, they claimed to jointly own the Manatee Bay Restaurant, listing this as a business interest worth $20,000, and Hansen and Hansen DDS, Ltd., valuing their interest in the latter as $100. (Pl. Ex. 26.) Duane Hansen was listed then as the owner of Rock River Dental, worth $100, Dental Designers, LLC, worth $100, and R & H Aviation, also listed as worth $100. Kathleen Hansen was listed as the owner of Georgetown Dental, LLC, worth $100, and "Primecare Dentall, LLC" [sic], worth $100.  Regarding the restaurant, the Hansens' Schedule B states that its "net worth is in the equipment only," specifying these to consist of a "[w]alk in Freezer, walk in refrigerator, burners, ovens and furniture."  Where asked to disclose executory contracts or unexpired leases in Schedule G, the Hansens listed a "Lease of Manatee Bay" to "Patricia Baggott to maintain property and general upkeep, for use of premises." (Schedules, Jan. 2, 2011, Case No. 10-B-55544, ECF No. 9).[11]

In addition, the Hansens disclosed in their 2011 Schedule I the average monthly gross wages, salary, and commissions for Duane to be $8,666.67 and Kathleen to be $9,000.  (Id.) They listed no other income. After deducting for payroll and social security taxes, their Schedule I lists their average total monthly income to be $15,435 after deductions. The Hansens listed their average monthly expenses as

---

[11] Although the Plaintiff only submitted as exhibits Schedules A and B from the 2010 bankruptcy case, the Court takes judicial notice of the other schedules and statement of financial affairs filed by the Debtor in that case. *See, e.g., Lulay Law Offices v. Rafter*, 2017 WL 4340089 n.1 (N.D. Ill. Sept. 29, 2017) (taking "judicial notice of matters of public record, such as filings in the bankruptcy court, even where not specifically referenced by the parties") (citing *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)).

$9,237.94, disclosing no business expenses. (*Id.*) Their Statement of Financial Affairs filed January 2, 2011 listed gross income of $320,000 for 2010, $362,876 for 2009 and $362,876 for 2008. (Case No. 10-B-55544, ECF No. 11.) It is also noteworthy that the Hansens' 2011 schedules also disclose among their "payment[s] to creditors" an October 19, 2010 payment of $9,000 to Pepperdine University for "Son's College Tuition." (*Id.*)

The court dismissed the Hansens' Chapter 11 case on June 16, 2011 on the motion of the Internal Revenue Service.

**The Florida Restaurant and Its Demise.** According to the Debtor's testimony at trial, at some point in 2010 or 2011 a Patricia Baggott approached the Debtor to express an interest in purchasing the Florida restaurant. (Tr. May 16, 2017, 141:24–142:6.)[12] They entered into some form of oral agreement whereby Baggott was to start running the business and pay the Debtor "after she got the place running – up and running." (Tr. May 16, 2017, 143: 2-11.) Under this "very loose deal," in the Debtor's words, Ms. Baggott operated the restaurant until December 2011. The Debtor claims that during this time neither he paid her nor she him (or the corporation) in connection with her running the business. Instead, he testified, only

---

[12] The Debtor first testified when questioned by the Bank that he entered into the arrangement in February or March 2011, qualifying this with comment that without his records he could not "say for sure." (Tr. May 16, 2017, 144:16-23.) Later, when testifying on his own behalf, Duane Hansen testified that he "began to have a relationship with [Ms. Baggot] relative to the business in 2010," which "ended in July of 2012 when she moved out of the building." (Tr. June 8, 2017, 29:20 – 30:4.) Schedule G, filed on January 2, 2011 in the Chapter 11 bankruptcy case states "Lease of Manatee Bay [to] Patricia Baggot," indicating that their business relationship began prior to January 2011. (Case No. 10-55544, ECF No. 9.) The description of a "lease" is inconsistent with the Debtor's testimony that Manatee Bay never leased the property to Ms. Baggot. (Tr. June 8, 2017, 17:5-8.)

to paying "off and on" certain maintenance expenses. (Tr. May 16, 2017, 145:2-8.)

The Parties have stipulated that the Florida "property was the subject of a theft at the Manatee Bay Restaurant, Inc." (Stipulation, ECF No. 138, ¶ 26.)  The Debtor testified that he received a telephone call in December 2011 from a person who claimed to be from the Munroe County, Florida sheriff's office.  According to the Debtor, the caller informed him that some of the equipment at the restaurant was missing. (Tr. May 16, 2017, 145:22–146:15.)  The Parties do not agree about the underlying facts, instead stipulating that a police report filed on December 21, 2011 listed "Debtor's tenant, Patricia Baggott, as a suspect." (ECF No.8, ¶ 23.)[13]  The Debtor testified that he did not personally file the police report[14] and that he did not visit the property after receiving the call.  He further testified that upon calling his insurance agent he understood the loss "was not covered" and took no further action.

The April 21, 2006 first mortgage, assignment of leases and rents and security agreement required the Hansens to maintain certain specified insurance on the collateral.  They were obliged to maintain "Property Insurance" whose policy would identify Eastern Savings Bank as the first mortgagee under a "'Florida Standard

---

[13] The Plaintiff's witness and associate general counsel, Douglas Durkin, vaguely suggested at least initially he suspected that the Debtor may have removed the equipment.  Durkin testified that he initially caused the bank to file a claim under the restaurant's insurance policy for "malicious mischief" rather than theft. (Tr. June 1, 2017, 157:9-18.)  He claimed that he did so on the basis of two unsolicited telephone calls he received on January 19, 2012 – inadmissible hearsay to the extent used to prove the Debtor's actual involvement, and which in any case are of doubtful veracity.  In any event, the Plaintiff's suggestion that the Debtor removed the property from his own restaurant is not supported by the evidence.

[14] The report lists the "Reporting Person" as "Michael Holland."  Although the narrative in the report describes Mr. Holland as "a legal representative of the victim Dr. Duane Hanson," no testimony or other non-hearsay evidence was presented as to who Mr. Holland is or his relationship to the Debtor. (Pl. Ex. 24.)

Mortgagee Clause' (noncontributory) endorsement." Similarly, the required "Liability Insurance" and "Worker's Compensation Insurance" were to name the Bank "as an additional insured," and their "Business Insurance" policy was to "contain a Loss Payable endorsement attached to the policy identifying" the Bank as first mortgagee. (Pl. Ex. 27).[15] In each case, the policy was to "provide for at least thirty (30) days written notice to [Eastern Savings Bank] in the event of policy cancellation and/or material change." (*Id.*) According to Mr. Durkin, it was important to the Bank that it be "named as mortgagee on the property insurance policy with regard to the building and the fixtures." (Tr. June 1, 2017, 74:12-14.) He stated that "with regard to the commercial property, there we would want to be named as loss payee." (*Id.* 74:15-16.) He indicated that the Bank would "love to be named as mortgagee on that, as well, but the insurance companies won't sell that insurance." (*Id.* 74:17-19).

Mr. Durkin testified that at the time of the inception of the loan, the Florida restaurant property was insured by Lloyd's of London. Although the policy named Manatee Bay Restaurant, Inc. as the insured, rather than the Hansens, Mr. Durkin testified that "it was the Bank's understanding from [the] Evidence of Insurance [issued by Lloyds] that we were covered both as to the building and fixtures, as well as to the contents." (Tr. June 1, 2017, 75:19.) According to Mr. Durkin, the policy was

---

[15] The second mortgage only stated that the borrowers must "keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term 'extended coverage,' and such other hazards as Lender may require ... in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender," without expressly specifying the required terms.

subsequently switched to Scottsdale Insurance Co., then back to Lloyd's of London and back to Scottsdale Insurance by the time of the incident. (Tr. June 1, 2017, 75:19-76:16.) Mr. Durkin testified that, as of the time of the loss, the Scottsdale Insurance policy "issued to Manatee Bay Restaurant, Inc. listed Eastern as the mortgagee, but not as the loss payee." (*Id.* 76:17-23.)

The Plaintiff did not present at trial any of these insurance policies. Mr. Durkin's testimony was unclear as to whether he believed any of the earlier policies complied with the Bank's lending requirements or not, and no evidence was presented to show if the Debtor knew whether any of the insurance policies complied. Mr. Durkin admitted that the "notice of loss came to me," that he "directed the investigation and the filing of the claim." (Tr. June 1, 2017, 75:7-12.)

Eastern Savings Bank eventually recovered at least a portion of its insurance claim. The Bank submitted a claim for $215,000 for "the full replacement cost of the contents and fixtures that were on the inventory." (Tr. June 1, 2017, 163:14-18.) The insurance company initially paid $11,000 in November 2013, for the value of the fixtures alone. Eastern Savings disputed this determination, claiming that the fixtures were worth $59,000. The insurer and the Bank eventually settled the claim for $44,500. (*Id.* 163:19-164:15.)

Mr. Durkin also testified that Eastern Savings Bank had "a vendor that audits or that receives the insurance invoices" (*Id.* 77:1-6), but that either the Bank had not been informed of the changes in the insurance policies, or failure to comply with the mortgage requirements "was not caught by the internal review." (*Id.* 191:19-23.) Mr.

Durkin suggested that the failure "wasn't caught" because "the policy issued with an Inc. as the name rather than to Dr. Hansen and Dr. Kathleen Hansen." (*Id.* 191:24-25.) But Durkin could not adequately explain why it was material that the policy was in the name of the corporation wholly owned by the Hansens[16] and he acknowledged that the Bank was able to receive at least a partial payment through a settlement with the insurance company. Further, Mr. Durkin admitted that the Bank made no effort to contact the Debtor to change the insurance policy or to obtain lender-placed insurance. (*Id.* 192:25-193:2.)

**The Debtor's 2012 Divorce.** The state court issued a default judgment for dissolution of marriage between the Debtor and Kathleen Hansen on May 29, 2012. (Pl. Ex. 19.) The judgment states that the North Barrington residence had been sold by Eastern Savings Bank in foreclosure and the Bank had received an *in personam* judgment against the Hansens of $3,951,520.82 on April 20, 2012. (*Id.* See also Stipulated Facts, ECF No. 138, ¶ 3.) The divorce judgment made the Debtor responsible for 75% of the deficiency and Kathleen responsible for the remainder. Kathleen was awarded the Hanover Park and Lansing properties and the Debtor was ordered to execute and deliver quit claim deeds to her. The judgment also awarded to Kathleen sole and exclusive ownership of the 2008 Mercedes-Benz ML 320, while Duane Hansen received sole and exclusive ownership of the 1990 Cadillac limousine, 1970 Piper PA-32-260, 1976 Piper PA-31-350, Toyota Prius and "any and all other vehicles in his possession." (Pl. Ex. 19.) Kathleen also received sole ownership of

---

[16] The record is not clear whether the personal property at issue was owned by the Hansens or by Manatee Bay Restaurant, Inc.

Georgetown Dental LLC and Primecare Dental LLC while the Debtor was awarded Rock River Dental, LLC and Dental Designers, LLC. The divorce judgment made no mention of the Florida properties, Manatee Bay Restaurant, Inc. or Hansen and Hansen DDS, Ltd. Finally, the judgment entered in the divorce proceedings found that the Hansens' emancipated son had completed three years of college at Pepperdine University and made the Debtor responsible for all of his son's future undergraduate or graduate school expenses.

Divorce counsel for Kathleen Hansen testified to preparing and sending to the Debtor quitclaim deeds for the Hanover Park and Lansing properties in January 2013 pursuant to the terms of the divorce judgment. However, Duane Hansen never returned the instruments to her, and she is not aware that he ever signed the quitclaim deeds. (Tr. June 1, 2017, 41:9-25.)

**Second Marriage.** Carmen Greenberg had worked at the Debtor's dental practices since 2006, first as a dental assistant and, by 2010 or 2011, as the office manager for Rock River Dental, LLC and Dental Designers, LLC. In 2012 and 2013, she worked approximately 20 hours per week at the dental practices paid at the rate of $14 per hour. During that time, she also was employed by a Rockford jewelry store and did occasional modeling work. Carmen testified that her annual income in 2012, 2013 and 2014 averaged between $30,000 and $45,000 per year. (Tr. June 1, 2017, 8:24-9:7.)

Duane and Carmen married on September 22, 2012. They held their wedding at the Wynstone Country Club in Barrington, Illinois. Carmen adopted Duane's last

name and is listed as the Debtor's spouse on his Chapter 7 bankruptcy petition. Carmen testified that she paid part of the cost of the wedding, estimating her contribution to be between $7,000 and $10,000. She claimed that the Debtor paid for the rest, but did not recall the amount. (*Id.* 9:11-10:8.) She further testified that she and the Debtor lived together between 2010 and 2015 in an apartment they rented from one John Paquin for $2,000 per month. (*Id.* 10:21-11:19.) According to her testimony, the Debtor paid this rent but she "helped pay some of it sometimes," giving him cash. (*Id.* 11:21-12:1.) She could not recall the amounts she gave the Debtor for this in 2012 and 2013.

Carmen Hansen testified that she and the Debtor travelled to California in 2012 or 2013 partly to attend his son's graduation from Pepperdine University and partly as a vacation. They flew to California in the Debtor's airplane. During this trip, Ms. Hansen recalled purchasing perfume at a shop in Beverly Hills. She admitted that the Debtor paid the $400 price with his credit card, claiming further, rather implausibly, that she later repaid him in cash for the amount because her "card wasn't working." (*Id.* 14:4-10.)

Even more implausible is her testimony that in August or September 2012 she purchased her own engagement and wedding rings from the jewelry store where she worked. The evidence shows otherwise. An August 15, 2012 invoice indicates that Duane Hansen paid the store $20,100 in cash. Subsequent statements indicate that Duane Hansen made cash payments on his account for the rings of $2,118.75 on February 15, 2013, and $1,000 on each of April 16, 2013, May 13, 2013, May 23, 2013,

June 22, 2013, November 2, 2013 and June 1, 2014. (Pl. Ex. 29, Tr. June 1, 2017, 25:1-27:16.)  Ms. Hansen's testimony that she bought the rings for herself using an inheritance from her grandmother (*id.* 18:9-12) simply does not hold water.  First, she admits that the Debtor, not she, made the payments to the jeweler.  However, she claims, he did so with cash that she gave him for that purpose. (*Id.* 27:12-16) (testifying that "I didn't physically go in there and make the payment. No, I did not."). She explains, incredibly, that she had Duane Hansen make the payments "because he knew the owner [s]o, he got a discount when he paid." (*Id.* 17:24-25.)  But, during this time Carmen was employed at that very store, and she knew the owners.  Indeed, she testified that she worked at the store because the owners "were family friends." (*Id.* 15:17-18.)

Carmen Hansen and the Debtor divorced in April 2015.

**Proceedings on the Bank Loans.**  Eastern Savings Bank completed the foreclosures and judicial sales of the North Barrington, Illinois, property and all of the Florida properties before the trial in this proceeding. (Tr. June 1, 2017, 180:21-181:2; 182:20-183:25.)  Mr. Durkin testified that the Bank was the winning bidder through credit bids.  He estimated its bid for the North Barrington property to be between $925,000 and $950,000, and that the Bank bid $100 in total for the five Florida properties.  The Bank later sold the five Florida properties.  According to Durkin, it sold the two empty Florida lots for $550,000.  The witness was unsure whether this subsequent recovery had been credited against the Debtor's indebtedness, stating when pressed, "as I told you, I'm not an Illinois lawyer. I can't

explain it exactly."[17] (*Id.* 184:16–185:20.)

In late December 2012 or early 2013, Eastern Savings Bank caused one or more citations to issue from the Lake County, Illinois, court to enforce its judgment. Duane Hansen admits that he was served with the citation notice and amended citation notice on February 6, 2013. (Resp., ECF No. 120, ¶ 74). While it appears that the Debtor responded to the citations, the Plaintiff did not present evidence as to what occurred or when.[18] However, the Debtor admits that he began using the dental business's corporate account to pay personal expenses to avoid the citation lien on his personal accounts. (*See, e.g.,* Resp., ECF No. 120, ¶ 11.) ("Debtor admits that after the creation of a Citation Lien on this personal account, thus freezing it, personal bills were paid from a business account. Generally speaking, business profits are the only source of income to pay any bills.")

Shortly after the citations were served on him, the Debtor met with John Gierum, a bankruptcy attorney. Mr. Gierum has extensive bankruptcy experience and served as a Chapter 7 panel trustee for 30 years. According to the testimony of attorney Gierum, the pending bankruptcy case was filed on "a rather time-sensitive basis, I believe because of the citation to discover asset status." (Tr. June 1, 2017, 142:3-5.) Acknowledging that the "original filing was a skeleton," he recalled "Dr. Hansen spending an entire afternoon in my office working on the schedules" and that

---

[17] Mr. Durkin also testified that the bank sold "the property" for $800,000, but it is unclear from context what he meant by "the property." (Tr. June 1, 2017, 182:7-10.)

[18] The Plaintiff presented copies of undated riders to the citation, which the Debtor testified contained his handwriting. (Pl. Ex. 31; Tr. May 16, 2016, 159:2-4.) However, the Plaintiff failed to establish the foundation for these documents, including whether, when or how the documents were presented in the citation proceeding.

he spent "up to ten hours ... in gathering the information for the schedules." (*Id.* 142:1-25.)

Mr. Gierum described at length the preparation of the Debtor's bankruptcy schedules. Gierum gave the Debtor the form schedules and statement of financial affairs, asking the Debtor to prepare them as best as the Debtor could and then return them. (*Id.* 143:16-144:1.)  The Debtor "provided the information."  Gierum and the Debtor "then reviewed each of those and discussed them to see if there perhaps could be something that was missing or could be more accurate." (*Id.* 150:8-10.)  The bankruptcy attorney testified that he "relied pretty heavily on Dr. Hansen regarding that information because it was a complicated situation." (*Id.* 143:1-3.)  Mr. Gierum stated that as they were preparing the schedules, the Debtor "said he currently at that time had no interest in any real estate." (*Id.* 153:7-9.)  Mr. Gierum stated under oath that he was not "made aware of any" losses with respect to personal property at the Florida restaurant or any other "contingent or unliquidated claims that the debtor might have" against others. (*Id.* 154: 6-13.)   According to Gierum, all of the information to be included in the schedules about the Debtor's wife's income came from the Debtor, and the Debtor did not inform him about the purchase of the $20,000 engagement ring. (*Id.* 155:2-12.)

**The Debtor's Chapter 7 Filings.**  The Debtor filed his bankruptcy schedules and statements, under penalty of perjury, on May 3, 2013, less than two weeks after he commenced this Chapter 7 case.  The schedules and statements filed do not list his interest in real property, automobiles, aircraft and accessories, or licenses.  Nor

do they disclose any liquidated debts owed to the debtor or contingent and unliquidated claims of any nature. (Pl. Ex. 1.) Where asked to disclose his stock or interests in incorporated or unincorporated businesses, Duane Hansen lists only his "100% interest in Dental Designers, LLC (believed that liquidation value of assets is less than liabilities)" and "100% interest in Rock River Dental (believed that liquidation value of assets is less than liabilities)." Each of these are valued at $100. (*Id.*) Where asked to disclose his checking, savings or other financial accounts, he responds: "business account (Hansen & Hansen) – no equitable interest as corporate asset: $200.00; business account Blackhawk Bank (Rock River Dental) frozen – no equitable interest as corporate asset: $5,000; Stillman Bank checking – frozen per citation: $800." (*Id.*)

His schedules disclose Eastern Savings Bank to be an unsecured creditor, and not a creditor holding secured claims. (*Id.*) The Debtor identified John Paquin's for a "Residence Lease $2,000/month yearly" as his only executory contract or unexpired lease. (*Id.*) In Schedule I, Duane Hansen estimates his average or projected income from operation of his business or profession to be $2,500 per month as of the petition date. There he further disclosed the average income of his nonfiling (then) spouse Carmen to be $500 per month after payroll taxes ($131.30) and Social Security. The Debtor's Schedule J states his average or projected monthly expenses to be $3,053.00, consisting of $2,000 rent, $400 for utilities, $500 for food, $50 for clothing, $50 in charitable donations and $53 for insurance premiums. The Debtor failed to attach the required detailed statement to explain his regular income from the operation of

his business.

The Debtor's Statement of Financial Affairs is similarly deficient. In it, Duane Hansen states his "gross amount of income ... received from employment, trade, or profession, or from operation of the debtor's business" to be "$10,000 2013 YTD approximately; $55,459.00 2012." For payments to creditors within 90 days he discloses "Only Landlord for Residence Monthly $2,000," and stated that he made no payments to insider creditors within one year. Where required to disclose repossessions, foreclosures and returns within one year of the petition, the Debtor lists only the 2012 foreclosure of the "Florida property" by Eastern Savings Bank. Where asked about "all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case"[19] Dr. Hansen marked "none." He lists no "property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding" the petition date and no property held for another person. And where asked to disclose his businesses or business activities within six years before the petition date, the Debtor lists: "Hansen And Hansen, DDS, Ltd., Dental Practice, 1987 to 2009; Rock River Dental, LLC, Dental Practice, 2009 to Present; Dental Designers, LLC, Dental Practice, 2009 to Present; Manatee Bay Rest., Inc., 2003 -2008; R & H Aviation, owned airplane, 2009 -2011."

On May 3, 2013, the Debtor signed his declaration under penalty of perjury, acknowledging that the summary and schedules filed in this case were true and

---

[19] "... except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member."

correct. He caused his declaration to be filed. Nearly four weeks later at the meeting of creditors, the Debtor testified under oath that his summary and schedules were true and correct. (Stipulation, ECF No. 138.)

**Undisclosed Interests in Hansen and Hansen and Related Assets.** In actuality the Debtor owned substantial property that he failed to disclose in his bankruptcy filings. While listing his interests in Dental Designers, LLC and Rock River Dental in Schedule B as his "Stock and interests in . . . businesses," he did not disclose his interest in Hansen and Hansen DDS, Ltd. At trial, the Debtor attempted to blame his attorney for this omission, claiming that Mr. Gierum advised him not to. Indeed, attorney Gierum testified that he listed Hansen and Hansen only "in the statement of financial affairs as a business interest because it wasn't operating at the time of the filing." (Tr. June 1, 2017, 144:10-24.) But Mr. Gierum also testified that he did so because the Debtor indicated to him that Hansen and Hansen "was not operating." Based on what the Debtor told him Mr. Gierum listed Hansen and Hansen in "the SOFA, question 18", as a business in which the Debtor was involved from "1987 to 2009." (*Id.* 153:19-154:5.) The disclosure falsely indicates either that the Debtor no longer owned an interest in the company after 2009 or that the company was no longer in existence after 2009.

The Debtor's schedules and statements do not disclose the substantial value of the Debtor's interests in that company or assets titled in its name which the Debtor freely used and enjoyed for his own purposes. These included the 1970 Piper Cherokee 260, which the Debtor stated in 2006 to be worth $125,000 and which the

Debtor used to fly with Carmen to see his son's graduation in California in late 2012 or early 2013. (Tr. May 16, 2017, 136:2-6; Tr. June 1, 2017, 12:16-13:7; Pl. Ex. 22.) The Debtor admitted that the Piper 260 "was owned free and clear of any liens by Hansen and Hansen." (Debtor's Local Rule 7056-2 Resp., ¶ 41.) The 1990 Cadillac limousine, which the Debtor had stated in his 2010 Chapter 11 bankruptcy case to be worth $3,925, was also titled in the name of Hansen and Hansen. (Pl. Ex. 28.)

Additionally, the business records of Dental Designers LLC and Rock River Dental LLC show numerous pre- and post-petition payments were made to the supposedly defunct and non-operating Hansen and Hansen. For example, Rock River Dental's records show it paying $26,250 in 2012 to Hansen and Hansen. (Pl. Ex. 4.). When asked about these payments listed in the financial statement, the Debtor testified that "[o]bviously, they still had receivable and expenses." (Tr. May 16, 2017, 45:25-46:2.) These transactions show that Hansen and Hansen DDS, LLC had value which the Debtor was aware of and should have disclosed. True, in describing his bank accounts in his Schedule B, Duane Hansen indicated that Hansen and Hansen had a bank account, listing a "business account (Hansen & Hansen) – no equitable interest as a corporate asset" with a value of "$200." (Pl. Ex. 1.) But that reference to Hansen and Hansen serves to disguise his interest in the bank account, as to which he listed having "no equitable interest." But at trial, he conceded that in fact he had been using and continued to use this supposedly 'corporate' account for his own personal expenses to avoid the effects of Eastern Saving's citation.

The greater weight of the evidence shows that as of the time of the petition,

Hansen and Hansen was indeed not operating as a business but rather maintained as a convenient shell with which the Debtor could conceal assets from his creditors. For example, although they were titled in the name of Hansen and Hansen, the record shows that the Debtor treated the Cadillac and Piper airplane as his personal property. The Debtor used the plane for personal vacations. He claims that Hansen and Hansen was no longer operating at the time he filed his petition and admits that the car and the airplane were not used in connection with its business – if they ever had been. Documents signed by the Debtor on April 16, 2013 – less than two weeks before the bankruptcy petition – in connection with his renewal of the airplane's insurance policy valued it at $60,000 and lists Duane Hansen individually as the named insured. (Pl. Ex. 12A.)   The evidence is clear and convincing that these valuable assets should have, but were not listed in his Chapter 7 schedules.

The Debtor used similar tactics to disguise his ownership of the Hyundai Elantra, which also was omitted from his bankruptcy schedules. The Debtor testified that he had "sole use of and made all payments on" and paid all "insurance and upkeep" on the vehicle which was titled in the name of Carmen's father. (Tr. June 8, 2017, 21:12-13; 21:23-22:1.)   Hansen further disguised his actual ownership of the vehicle by causing his wholly-owned company Dental Designers to pay for its maintenance and to "pay[] Wells Fargo for the regular car payment in 2012" through checks the Debtor wrote on his company's account. (Tr. May 16, 2017, 55:23-57:25.) The Debtor offers no credible evidence that anyone else used the vehicle since the time it was purchased. At trial he testified that he has been driving it since 2011,

when his Jeep stopped running. (Tr. June 8, 2017, 20:18-24.) The Debtor admits that he had sole possession and use of the vehicle since 2011 and has, since that time, paid all expenses and loan payments on it, continuing to be its sole driver even after he and Carmen divorced in April 2015. In contrast to this uncontroverted evidence as to its actual owner, the Debtor offers the self-serving explanation that his former father-in-law "just basically allow[ed him] to drive it." This is directly contradicted by the Debtor's own Statement of Financial Affairs which states that there is no "property owned by another person that the debtor holds or controls." (Pl. Ex. 1.) Thus, even if the father-in-law were the true owner of the car, the Debtor still would have knowingly made material false statements under oath in his schedules by failing to list his possession of the car. As such, the evidence presented coupled with the Debtor's general lack of credibility at trial leaves the Court to conclude that he in fact is the true owner of the vehicle and that he knowingly failed to disclose his interest in it in his bankruptcy. *See In re Church*, 206 B.R. 180, 185 (Bankr. S.D. Ill. 1997) (discussing constructive ownership of a vehicle, even though title is in the name of another, under Illinois law).

In like fashion the Debtor also failed to list his interest in Manatee Bay Restaurant, Inc. The Debtors mention of Manatee Bay as a former business in his Statement of Financial Affairs is inaccurate and misleading as it indicates that the business existed from "2003 – 2008" even though the restaurant was apparently still operating under the Debtor's admitted "loose agreement" with Patricia Baggott until the time of the theft in December 2011. Unlike Hansen & Hansen, there is no

suggestion in the record that Manatee Bay Restaurant, Inc. was ever dissolved. Indeed, the Parties stipulate that as of the date of trial the Debtor remained the owner of at least 50% of the company. Listing the "ending date" of 2008 – a date more than four years before the petition date and therefore likely beyond many statutes of limitation, such as for a fraudulent transfer claim – disguises the much more recent events relevant to that business, such as the theft at the restaurant, insurance claims and foreclosure proceedings on the business's premises.

The record further shows that the Debtor also either omitted assets which he jointly owned with Carmen, or made a false statement under oath when he testified at the meeting of creditors that Carmen Hansen "had no separate assets from his other than a car." (Debtor's Local Rule 7056-2 Resp., ECF No. 120 ¶ 57.) At the very least the evidence establishes that, as of the petition date, Carmen owned the undisclosed engagement ring worth more than $20,000. The record also indicates that the Debtor either had an interest in the car that Carmen was driving or previously had an interest in the vehicle and failed to disclose the transfer of such interest to Carmen. Corporate documents and receipts showed that the Debtor's wholly owned company, Dental Designers, paid maintenance and repair costs in January and February 2013 for the "2007 Toyota" being driven by Carmen. (Pl. Ex. 12J.) Carmen testified that in 2012 and 2013 "there were payments that were made to Toyota on the car at that time" and that she "believe[d]" the Debtor made them either directly or through his dental business. (Tr. June 1, 2017, 28:18-25.) The May 29, 2012 divorce judgment awarded the Debtor a "Toyota Prius," (Pl. Ex. 19) and

Kathleen's divorce attorney testified at trial that there "was a Toyota Prius which Dr. Duane Hansen had purchased and, . . . to the best of our knowledge, was being driven by his girlfriend, Carmen Greenberg, at the time that [the divorce] judgment was entered." (Tr. June 1, 2017, 40:10-15.)

The evidence also shows that as of the petition date, the Debtor had an interest in one or more hangars at Rockford International Airport which he failed to disclose in his bankruptcy schedules either as an asset or an unexpired lease or executory contract. The Debtor vaguely recalled at trial transferring his interest in the hangers: he claimed to be "not sure of the date[, t]he ownership went between a mechanic and myself [s]o at this date, I can't answer that." (Tr. May 16, 2017, 30:24-31:5.) But he also testified that he had "had an interest in the hangar since 2006, approximately" (*Id.* 31:6-8), and that he was "part of the group that owns – that has a participation or interest in [a] ground lease" with a 'Tee hangar' located on it, and continued to pay monthly rent on such lease post-petition. (Tr. May 16, 2017, 32:1-8.) When asked at trial about payments made by Rock River Dental to an individual named John Spitzer, the Debtor testified that Mr. Spitzer was the treasurer of the hangar group. (Tr. May 16, 2017, 79:10-12.) When asked if a $500 payment to Mr. Spitzer was a payment for "your interest in the airplane hangar," the Debtor testified, "For the rent payment, yes." (*Id.* 79:13-16.) The Debtor has further admitted that in his bankruptcy schedules he "failed to report his interest in the airplane hangar" and that in fact "he was a part owner of the airplane hangar in Rockford." (Debtor's Local Rule 7056-2 Resp., ECF No. 120, ¶¶ 47-48.)

The Debtor also failed to disclose his current or former interests in the Hanover Park and Lansing properties that were awarded to Kathleen by the divorce judgment less than a year before his bankruptcy petition. According to the Debtor's schedules filed in the 2010 Chapter 11 case, he and Kathleen had owned the properties jointly in fee simple prior to the divorce. Although the divorce judgment awarded the properties to Kathleen, it also required the Debtor to sign quitclaim deeds transferring the properties, which he never did. But even if the Debtor honestly believed that the properties had transferred to Kathleen in May 2012 by operation of the divorce judgment, he failed to disclose such transfer or the divorce proceeding at all in his bankruptcy schedules as required. In response to the question in the Statement of Financial Affairs about "all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case," he disclosed only three collection actions including the suit by the Bank and did not list the divorce proceeding.

Even properties listed in his bankruptcy schedules were described in false or misleading ways. For example, the Debtor valued his interest in Rock River Dental, LLC as worth only $100, despite the fact that the company's 2012 federal tax return reported the entity having $48,130 in assets with no third-party liabilities. The tax return also reported the Debtor to be the corporation's sole owner. (Pl. Ex. 3.) The Debtor also listed his interest in Dental Designers, LLC as worth $100, despite the fact that the company's 2012 federal tax return reported assets totaling $50,998 without any third-party liabilities. Again, the Debtor is shown to be its sole owner.

(Pl. Ex. 5.)[20] Not only is the $100 valuation in the schedule grossly inaccurate, but his accompanying comment that he "believed that liquidation value of assets is less than liabilities" is patently false.   No evidence was presented to show that the companies had drastically changed in value from the beginning of the year to the April petition date, or to show the Debtor reasonably believed the value to have decreased.   Nor did the Debtor present credible evidence that he believed either company had any third-party liability, or that its tax return was incorrect.

Rock River Dental's 2013 federal tax returns reported almost $300,000 in gross profit during 2013.   Dental Designers' returns acknowledged more than $350,000 in gross profit during 2013. (Pl. Ex. 7, Ex. 11.)   The companies' 2013 federal tax returns showed no third-party liabilities either at the beginning or end of the tax year. (Pl. Ex. 7, Ex. 11.)

The testimony at trial shows that the Debtor knew that his expected or projected monthly income as of the date of the petition greatly exceeded the $2,500 listed in his bankruptcy schedules.   Contrary to his statement in his Statement of Financial Affairs that his 2012 gross income amounted to only $55,459.00, his 2012

---

[20] Although the balance sheet in Dental Designers' 2012 tax return suggests that the Debtor's capital account (the sole entry for liabilities and capital) decreased from $55,755 at the beginning of the year to -$19,754 at the end of the year, this is solely attributable to the claimed net operating loss of -$75,509 for year 2012.  This net loss for tax purposes, in turn, is based on the $482,486 in total deductions against the $406,977 for total income.  However, testimony at trial cast in doubt at least some of the $275,411 in itemized "other deductions," or at least suggested that such expenses were for the Debtor and his spouse's personal benefit.  For example, the itemized deductions include $10,419 in "automobile expense" which, as discussed elsewhere in this Opinion, was for maintenance and loan payments on cars used by the Debtor and Carmen – at least one of which was titled in Carmen's father's name.  Also included as an itemized expense was $915 for "Travel Expenses" which testimony at trial showed was in fact for a limousine rental at the Debtor and Carmen's wedding.  $10,763 in itemized expenses were for the Debtor's membership at the Wynstone Country Club, which testimony showed was not located anywhere near or otherwise related to Dental Designers' business. (Pl. Ex. 5, Ex. 6.)

individual federal tax return indicates that he received $122,509 in adjusted gross income that year, consisting of $55,460 in wages, salaries and tips and $67,049 in rental real estate, royalties, partnerships, S corporations, trusts, etc. (Pl. Ex. 2.) Schedule E to the tax return shows that the Debtor actually received $142,558 in corporate income from Dental Designers and Rock River Dental Inc., from which he offset $75,509 in losses.[21]

The Debtor testified that the $2,500 average monthly income that he listed in his Schedule I reflected only his "paycheck from the [dental] corporation[s]" that he owned and "did not include any distributions from [his] partnership or any of the dental practices [or] any personal expenses that were paid by the business on [his] behalf." (Tr. May 16, 2017, 35:4-12.) This, of course, greatly understates his actual income. The evidence leaves no doubt that the Debtor was aware of this fact. First, even if limited to purely his "paycheck," Hansen's "estimate" still under-estimates his income. His 2012 federal tax return listed $55,460 in wages and salary, which would amount to $4,621.67 on a monthly basis, or almost twice the amount claimed in the bankruptcy schedules. (Pl. Ex. 2.) His 2013 federal tax return listed $42,302 in wages and salary, or $3,525.17 per month – still over $1,000 more than the $2,500 claimed in his bankruptcy schedules. (Pl. Ex. 8.) Moreover, although Schedule I clearly asks for income in addition to wages, salary and commissions, the Debtor only listed the

---

[21] As discussed below, Dental Designers' reported operating loss was due in part to deductions it took for so-called expenses which directly benefited the Debtor and his wife, including over $10,000 for the cost of his wedding and his personal country club membership dues and over $10,000 for auto loan payments and maintenance expenses for the two cars he and his wife drove (one of which was titled in the wife's father's name). The value of these benefits does not appear to be included in the adjusted gross income the Debtor listed in his federal tax return.

$2,500 under the category "Regular income from operation of business or profession or farm (attach detailed statement)," doing so without attaching the requested statement.

The Debtor cannot play dumb. His testimony at trial shows that he was well aware that he received income from his wholly-owned dental practices in addition to his "W-2" or "paycheck" income. Additionally, Dr. Hansen, himself no stranger to bankruptcy by the time he filed his individual Chapter 7 petition, engaged and consulted with an experienced bankruptcy counsel in preparing his schedules and statements. He cannot be credibly heard to claim ignorance of the Bankruptcy Code's expansive definition of "income." Indeed, while Mr. Gierum testified that the Debtor's "first draft wasn't particularly thorough," he acknowledged at trial that he and the Debtor "reviewed each of those and discussed them to see if there perhaps could be something that was missing or could be more accurate." (Tr. June 1, 2017, 150:5-15.)

Moreover, the record shows that the Debtor was an experienced businessman who owned multiple dental practices for more than 25 years with an eye to the business details. He employed an accountant to prepare his and his businesses' tax returns. But he admitted that he did much of the bookkeeping for the businesses himself. The Debtor testified that he personally "would keep track of expenses for the business on QuickBooks" and "would submit all of the QuickBook ledgers and reports to [his accountant] at the end of the year," after which the accountant would often "ask for additional information." (Tr. June 8, 2017, 24:5-11.) He further testified that since he formed the first dental practice in 1985 he followed "a process for

keeping track of what was personal and what was corporate" whereby "[i]nvoices were marked, receipts were marked if they were personal, and then held for the end of the year or quarterly reporting." He boasted that he followed this procedure "continually on a line straight through [the day of testimony.]" (Tr. May 16, 2017, 170:16-171:10.) Dr. Hansen stated that he would always "review with the QuickBooks and mark with invoices and/or bills what was business or personal and then let [his accountant] know, whether they were credit cards or other, how much was -- of the total expenses were business, how much was personal." (Tr. May 16, 2017, 171:21-25.) Although his accountant was involved in the process, the Debtor admitted that virtually all information provided to the accountant came from the Debtor and that the Debtor was aware certain expenses paid by the dental practices were for him personally and not legitimate business expenses.

The Debtor also testified that when he listed his income in his bankruptcy schedules as "only $2,500 a month, [he] did not consider what was taxable income versus what amounts came into [his] pocket." (Tr. May 16, 2017, 176:11-16.) He admitted that while he listed his 2013 income to be $2,500 per month in his schedules, his actual taxable income for 2013 was $101,000 (Tr. May 16, 2017, 176:21-177:4) and that his taxable income for 2012 "was approximately the same amount." The Debtor reported on his 2014 tax returns that his income amounted to approximately $122,000. (Tr. May 16, 2017, 176:21-177:4.) On cross-examination, Dr. Hansen admitted that he was aware such amounts are "a lot different than $2,500 a month." (Tr. May 16, 2017, 177:5-6.)

The record demonstrates that at least part of his additional income was in the form of personal expenses which he caused his solely owned businesses to pay on his behalf. For example, during the year preceding the petition date, Dental Designers paid Duane Hansen's membership dues and numerous other personal expenses incurred at Wynstone Country Club: $1,037.88 on April 19, 2013, $935.57 on March 21, 2013, $325 on February 18, 2013, $325 on December 21, 2012, $475 on November 20, 2012, $7,932.47 on October 19, 2012, $1,427.32 on September 20, 2012, $301.53 on August 15, 2012, and $301.53 on July 27, 2012. (Pl. Ex. 6, Ex. 12.) The Debtor's home was located in Barrington's Wynstone subdivision. He became a "social member of Wystone Country Club when [he] became a resident of that subdivision and purchased the house." (Tr. May 16, 2017, 63:4-10.) In addition, Dr. Hansen admitted that Dental Designers' September and October payments to the country club paid charges for his wedding. (Tr. May 16, 2017, 64:3-8.)

The Debtor also caused the companies to pay expenses associated with the airplane and vehicles he owned or used. Rock River Dental paid $500 for the "rent payment" on the Debtor's "interest in [an] airplane hangar" on March 15, 2013 and $130.66 for an "insurance payment" for the Piper airplane owned by the Debtor. (Pl. Ex. 9, Tr. May 16, 2017, 79:13-22.) On February 4, 2013 Dental Designers paid $270.10 for insurance on the Debtor's airplane. (Pl. Ex. 11, Tr. May 16, 2017, 98:24-99:2.) Dental Designers also paid for repairs to the Debtor's Hyundai Elantra of $37.86 on February 12, 2013, and made loan payments on the car: $550 on January 3, 2013, $500 on February 4, 2013 and $500 on April 5, 2013. The company also paid

$408.30 on February 2, 2013 and $160.44 on February 19, 2013 for repairs to the Toyota his wife, Carmen, drove. (Pl. Ex. 12-J.) Carmen testified that sometimes she and Dr. Hansen obtained barter services for their cars through the dental practices, working, as she described it, "with a patient of ours who did work on cars, I guess, and we did dental work for them." (Tr. June 1, 2017, 28:4-14.)

The business records of Dental Designers, LLC show that it paid the $4,000 retainer to the Debtor's bankruptcy attorney on April 23, 2013. (Pl. Ex. 11.) The Debtor disclosed the payment of the retainer in his Statement of Financial Affairs, but by leaving blank the "name of payor if other than debtor" implied that he made the payment directly. (Case no. 13-B-81444, ECF No. 17.) During the period shortly prior to the petition date and continuing post-petition, the Debtor apparently increased the frequency of times he caused the dental practices to pay for expenses on his behalf, admitting that he caused the dental business's corporate account to pay his personal expenses to avoid the Bank's citation lien on his personal accounts. (Resp., ECF No. 120, ¶ 11). Examples of this include Dental Designers' purported purchase of $560.56 (before tax) of goods at Sam's Club on November 3, 2012, a transaction the Debtor designated to be personal to himself (Tr. May 16, 2017, 107:19-108:9, Pl. Ex. 12E), and a $15,900 cash payment by Dental Designers to the Debtor on April 19, 2013, about which at trial he had "no recollection" as to where the proceeds went. (Pl. Ex. 12-H, Tr. May 16, 2017, 101:5-16.) Evidence also was received without objection of Dental Designers paying certain utility bills for the Debtor's residence: $505.39 on March 21, 2013 and $401.14 on April 1, 2013. (Pl. Ex. 12-I, Tr.

May 16, 2017, 112:2-10.)

The Debtor also failed to disclose transfers he made to or for the benefit of insiders within one year before the petition date. He listed "none" where asked in his Statement of Financial Affairs for "all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient" and for "all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case." (Pl. Ex. 1.) The evidence shows that Dr. Hansen paid his adult son's college tuition through checks drawn on Rock River Dental's account $2,412.99 on July 6, 2012 and $7,856.00 on August 31, 2012. (Pl. Ex. 4A, Tr. May 16, 2017, 50:15-51:20.) He also caused Rock River Dental to pay his son $250 on January 4, 2013 as "a birthday present." (Pl. Ex. 9, Tr. May 16, 2017, 80:11-14.) That company's records also show a payment of $1,000 to the Debtor's son on January 21, 2013 as a "Payroll Expense" (Pl. Ex. 9), despite the uncontested fact that his son was attending Pepperdine University in California at the time and was not then an employee of the Rockford company. Although the Debtor testified that he was "not sure" whether the $1,000 payment was for his son's college-related living expenses, he testified that similar payments of $1,000 each by Dental Designers, LLC in September and October 2013 were "for college expenses and so forth." (Tr. May 16, 2017, 82:15-19, 102:23-

103:18.)  Dental Designers also paid his son $500 on March 22, 2013 and $500 on April 18, 2013, which payments the Debtor admitted were "for his college expenses and living expenses out in California." (Pl. Ex. 11; Tr. May 16, 2017.)

## JURISDICTION

Discharge is a right that is expressly created by title 11 and would have no existence if not created by the Bankruptcy Code.  Proceedings on an objection to a debtor's discharge or to object to the dischargeability of a debt therefore arise in a case under title 11.  *See Kontrick v. Ryan*, 540 U.S. 443, 453 (2004) ("Congress authorized bankruptcy courts to adjudicate, *inter alia*, objections to discharge."). Accordingly, this Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  It is a core proceeding under 28 U.S.C. § 157(b)(2)(J) in which this court has constitutional authority to enter final orders. *See, e.g., In re Yotis*, 521 B.R. 625, 631 (Bankr. N.D. Ill. 2014) (discharge "'stems from the bankruptcy itself,' and may constitutionally be decided by a bankruptcy judge") (citing *Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011)).

## DISCUSSION

### A. Plaintiff Has Met its Burden to Object to Discharge Under Section 727(a)(4) (False Oath) and 727(a)(2)(Transfer/Concealment of Assets).

*Section 727(a)(4).*

To establish grounds to deny a discharge on the basis of a false oath, the plaintiff must demonstrate by a preponderance of the evidence that: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the

statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). "A debtor's petition, schedules, statement of financial affairs, statements made at a section 341 meeting, testimony given at a Bankruptcy Rule 2004 examination, and answers to interrogatories all constitute statements under oath for purposes of section 727(a)(4)(A)." *Schaumburg Bank & Trust Co. v. Hartford (In re Hartford)*, 525 B.R. 895, 907–08 (Bankr. N.D. Ill. 2015). Omissions in bankruptcy schedules can constitute false statements under oath supporting an objection to discharge under Section 727(a)(4). *See, e.g., Skavysh v. Katsman (In re Katsman)*, 771 F.3d 1048 (7th Cir. 2014) (failure to schedule creditors, property jointly owned with ex-husband or alimony payments supported denial of discharge under Section 727(a)(4)). Similarly, a debtor's testimony at a Section 341 meeting is "under oath," 11 U.S.C. § 343, and false testimony given during that examination may support an objection to discharge. *Schaumburg Bank & Trust Co. v. Hartford*, 525 B.R. at 908.

Materiality "in the bankruptcy context has a broad meaning: 'a fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.'" *Lardas v. Grcic*, 847 F.3d 561, 570 (7th Cir. Feb. 3, 2017) (quoting *Stamat*, 635 F.3d at 982). The plaintiff does not need to demonstrate "an affirmative detriment" to creditors to support an objection to discharge, for the "successful functioning of the Bankruptcy Code hinges both upon the bankruptcy's veracity and

his willingness to make a full disclosure." *Id.*

Here the Debtor made numerous material false statements in his bankruptcy schedules. He stated in Schedule I to his bankruptcy petition that his monthly income as of the time of the petition was $2,500 per month, or $30,000 per year, when his 2013 federal individual income tax return showed his income was in fact at least $101,000 per year at the time, more than three times higher. He falsely stated in the same schedule that his wife's income as of the petition date was only $500, or $6,000 per year. Her testimony at trial revealed that her income was in fact $30,000 to $45,000 per year, more than five times higher. His Statement of Financial Affairs falsely stated that his gross income in 2012 was only $55,459 when his 2012 federal individual income tax return shows that even his adjusted gross income then to be at least $122,509.

In his Schedule B Hansen severely undervalued his 100% interests in Dental Designers, LLC and Rock River Dental, LLC, claiming each to be worth only $100, and further stating that for each the "liquidation value of assets is less than liabilities." To the contrary, the evidence demonstrates that as of the petition date neither entity had any third-party liabilities and each had unencumbered assets worth at least $45,000. Nor can he argue that his undervaluation was a mere discount for a difficult to determine 'liquidation' value of illiquid assets. According to its 2013 tax return, Rock River Dental had $40,138 in *cash* as of the beginning of 2013 and $46,386 in cash as of the end of 2013. Both entities were operating as of the petition date and each entity generated more than $275,000 in gross revenues in

2013.

The evidence presented at trial demonstrated that the Debtor maintained an interest in Hansen and Hansen, LLC and used as his own, assets nominally held in that entity's name. Dr. Hansen, however, did not list his interest in Hansen and Hansen, LLC in his Schedule B. Nor did he list his interests in the 1970 Piper 260 Cherokee airplane or 1990 Cadillac limousine that the evidence shows were used solely for the Debtor's own personal benefit.

In similar fashion, the Debtor did not list his interest in the 2011 Hyundai Elantra titled in his father-in-law's name. Again, the evidence showed, Dr. Hansen alone drove, possessed and paid all expenses for the vehicle, including all payments on the purchase loan. He is hopelessly enmeshed in his false statements about this vehicle. Even if the Debtor's testimony that the father-in-law owned the vehicle could be believed, contrary to the evidence of its actual ownership, he still cannot explain his false representation in his Statement of Financial Affairs that he did not possess any assets owned by another. Nor does his Schedule G disclose any agreement with the father-in-law for use of the vehicle in exchange for payment of the car loan and other expenses.

Nor are his nondisclosures limited to movable assets. The Debtor failed to list his interest in Manatee Bay Restaurant, Inc. in Schedule B. Nor did he disclose his or the restaurant's potential claim for the missing equipment and fixtures existing. Closer to home, Dr. Hansen also did not disclose his interest in the ground lease and hangar at the Rockford International Airport as an asset in Schedule B or as an

executory contract or unexpired lease in Schedule G.

This pattern of concealment is not limited to his bankruptcy schedules. Though required to list all suits or administrative proceedings pending within one year of the petition in his Statement of Financial Affairs, Dr. Hansen did not disclose his 2012 Lake County divorce proceeding with Kathleen Hansen. Nor did his Statement of Financial Affairs list the Debtor's transfer of his joint interest in the Hanover Park and Lansing real properties pursuant to the judgment for dissolution of marriage.[22]   Notably, Dr. Hansen also failed to disclose in his Statement of Financial Affairs his substantial gifts or transfers to or for the benefit of family members within one year before the petition date. These included the engagement ring and other jewelry worth more than $20,000 that he gave to Carmen in September 2012. He also did not list tuition payments for his son's college education at Pepperdine University through checks drawn on the accounts of his wholly-owned dental practices of $2,412.99 on July 6, 2012 and $7,856.00 on August 31, 2012. Nor did he list his gifts to his son of $250 on January 4, 2013 and $1,000 on January 21, 2013.

The court also finds that the Plaintiff demonstrated by the preponderance of the evidence that the Debtor knew these statements were false and made them with fraudulent intent. Because fraud is rarely admitted, "[f]raudulent intent may be proven with circumstantial evidence." *Cantwell & Cantwell v. Vicario*, 464 B.R. 776, 789 (N.D. Ill. 2011) (citing *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th

---

[22] Or disclose – to the extent title had not transferred as of the petition date – his interest in such property in his Schedule A.

Cir. 2009)). In an action under Section 727(A)(4), a "showing of reckless disregard for the truth is sufficient to prove fraudulent intent." *Stamat v. Neary*, 635 F.3d at 982. Additionally, omissions need not be viewed in isolation. Even if a particular omission does not appear to be fraudulent, where "part of a larger picture of omissions and errors," the "cumulative effect of false statements may ... evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." *Id.* (citing *In re Duncan*, 562 F.3d 688, 695 (5th Cir. 2009)).

In *Stamat v. Neary*, the Seventh Circuit of Appeals took note of the debtors' "level of education and business experience" in concluding that their "failure to disclose the required past business interests, property transfers, and income [showed] a reckless disregard sufficient for the bankruptcy court's finding of intent under section 727(a)(4)." 635 F.3d at 982. In that case, one of the debtors was a doctor who operated his own medical practice. Holding a bachelor's degree in mathematics and accounting, the co-debtor owned and operated a billing company in addition to handling the billing for her husband's medical practice. 562 F.3d at 977. Here, too, the Debtor is highly educated and business-savvy. Possessing a dentistry degree, Dr. Hansen has owned and operated a number of businesses, including three dental practices and a restaurant. The Debtor admits that he did much of the bookkeeping for his dental practices himself, including keeping track of expenses for the businesses on QuickBook. Nor was the Debtor some incautious amateur. As shown by his testimony he regularly submitted all of the QuickBook ledgers and reports to his accountant.

Nor is this the Debtor's first brush with bankruptcy. He filed a joint Chapter 11 case with his ex-spouse Kathleen on December 16, 2010, just over two years before this case. In the earlier Chapter 11 case he had disclosed certain types of information which he failed to disclose in the current Chapter 7 case, indicating the Debtor's familiarity with the schedules and statements to be submitted under oath and the information they require. For example, in the earlier bankruptcy Dr. Duane Hansen disclosed his 2010 payment to Pepperdine for his son's tuition while he omitted similar 2012 payments from his Statement of Financial Affairs filed in this case. In the earlier Chapter 11 case, Dr. Duane Hansen also disclosed his interests in Manatee Bay Restaurant, Inc. and Hansen and Hansen DDS, Ltd., his dental license, as well as the 1990 Cadillac limousine and the 1970 Piper 260 airplane. Nevertheless he did not list his interest in these assets in his later-filed Chapter 7 case, even though the evidence shows that his ownership either had not changed or had actually increased due to the intervening divorce decree.

The Debtor failed to credibly explain at trial his failure to disclose these interests, instead largely attempting to lay blame on his attorney Mr. Gierum and his accountant Mr. Ford. Yet both Gierum and Ford testified that the information they used to prepare the bankruptcy schedules and tax filings came from the Debtor. Mr. Gierum testified that the Debtor filled out draft bankruptcy schedules which the attorney then reviewed and discussed with the Dr. Hansen to prepare the final versions. Regarding his income, while the Debtor testified that his accountant was involved in the process of determining for tax purposes what dental practice

expenditures should be treated as deductible expenses of the practice and which should be treated as the Debtor's personal income, Dr. Hansen admitted under oath that it was he who initially tracked expenses, marked receipts as personal or business and provided the selected information to the accountant. The Debtor further testified that he followed this procedure since 1985. Even if the Debtor did not know to the penny as of the petition date what his income for tax purposes was, adjusted for personal expenses paid by the companies, his testimony shows that he did or should have known that his income far exceeded the $2,500 per month amount that he listed in his Chapter 7 bankruptcy. Indeed, on April 19, 2013 – four days before he filed his petition – Dental Designers paid him $15,900 and on the same day paid $1,037.88 to Wynstone Country Club for the Debtor's membership dues. These two payments on April 19 alone far exceeded the $10,000 he disclosed to be his 2013 year-to-date income in his Statement of Financial Affairs.

The Debtor cites a recent decision of the Seventh Circuit to argue that the Debtor's "testimony about advice from her bankruptcy attorney [to be] one kind of evidence that may tend to negate *fraudulent* intent." *In re Kempff,* 847 F.3d 444, 451 (7th Cir. 2017). His reliance on *Kempff* is misplaced. The bankruptcy court there found the debtor's testimony to be "'very credible' and concluded that the errors resulted from either a misunderstanding or the 'utter incompetence' of [her] attorney, not any fraudulent intent on her part." *Id.* at 449. As discussed above, however, we find Dr. Hansen's testimony about his lack of fraudulent intent to be wholly incredible. In contrast to *Kempff,* Dr. Hansen's attorney is a highly experienced

bankruptcy attorney with over 30 years of experience, much of it as a panel Chapter 7 trustee. The weight of the evidence shows that the false statements in the schedules were the result of the Debtor supplying attorney Gierum with false or incomplete information and did not result from any advice received from Mr. Gierum. At the Section 341 meeting of creditors, the Debtor only compounded these omissions by testifying under oath that the schedules were true and correct. The Debtor never even amended his schedules to correct the false statements contained in them, despite obtaining new bankruptcy counsel.

The Debtor raises two arguments with respect to the Bank's Section 727(a)(4) claim. First, generally he argues that a single creditor cannot or should not be allowed to object to a debtor's discharge. He further asserts that a creditor objecting to discharge under Section 727(a)(4) on the basis of a false statement must show that she suffered calculable monetary harm as a direct result of the false statement. Neither argument is supported in law.

The Debtor begins with the bald assertion that:

> Section 727 of the Bankruptcy Code addresses the question of the availability of the Bankruptcy Code itself and any claimed abuse of its provisions. It may be brought by the trustee, a creditor or a person in interest. (check citation) [sic] The purpose of the section is to allow for the dismissal of the bankruptcy in its entirety. As such, it may be for the benefit of all of the creditors. However, in this case, one creditor will receive over 90% of what may be recovered and one other creditor will receive the rest.

(*See* Debtor's Post-Trial Br., ECF No. 146.)  This statement, to put it kindly, is puzzling. Section 727 of the Bankruptcy Code does *not* address "the question of the availability of the Bankruptcy Code itself" or "allow for the dismissal of the

bankruptcy in its entirety." Section 109 of the Bankruptcy Code addresses eligibility to file a bankruptcy petition. Section 707, not Section 727, provides for dismissal of a Chapter 7 case. The Plaintiff is not moving for the dismissal of the bankruptcy case.[23]

In the event the Debtor means to address the Section 727 objections to discharge that are at issue here, his suggestion that a single large creditor should not be permitted to rely on the section absent a showing that its objection will benefit all creditors borders on the preposterous. Section 727 expressly grants standing to single creditors: the "trustee, a creditor, or the United States trustee may object to the granting of a discharge under subsection (a) of this section." 11 U.S.C. § 727(c)(1). *See, e.g., Lardas v. Grcic*, 847 F.3d 561, 569 (7th Cir. 2017); *Skavysh v. Katsman*, 771 F.3d 1048, 1051 (7th Cir. 2014) (emphasis supplied) (affirming denial of discharge under Section 727(a)(4)(A) in proceedings brought by single creditors).

The argument that Eastern Savings Bank should be precluded from objecting to the Debtor's discharge because its claim is large in comparison to other creditors is equally baffling. A larger creditor is usually more affected by the grant or denial of discharge, not less. More importantly, the statute expressly grants standing to "a creditor" without making distinction as to the size or nature of the claims the creditor holds. As enacted by Congress, the Bankruptcy Code explicitly provides for both

---

[23] Section 727(a), which is invoked by the Plaintiff, sets forth situations in which a Chapter 7 debtor will not be granted a discharge. Some of those situations involve debtor misbehavior of the debtor during and in connection with the bankruptcy case, some concern misbehavior of the debtor prior to a case, and some situations are not based on bad behavior at all. *See, e.g.*, 11 U.S.C. § 727(a)(1) (providing that a debtor who "is not an individual" shall not receive a discharge).

challenges to the dischargeability of single debts and objections to a debtor receiving a discharge in full by creating a cause of action in Section 523(a) for creditors to seek to except specific debts distinct from the separate cause of action to discharge provided under in Section 727(a).

The Debtor next purports to address Section 727(a)(4) directly, arguing there "is no evidence that the Bank in any material way is harmed by the actions of Dr. Hansen in relation to the bankruptcy filing." (Debtor's Post-Trial Br., 9.) He then attempts to explain by stating "[t]he bankruptcy schedules and related filings were not materially wrong. The Bank has not established any dollar amount of mistake or omission in them. The Bank is merely looking out only for itself and wanting to levy on Dr. Hansen for as long as he has non-exempt assets." (*Id.*)

However, the Seventh Circuit has expressly held that the plaintiff need not demonstrate "an affirmative detriment" to creditors, *Lardas*, 847 F.3d at 570, or that the debtor "intended by her false statements to obtain a pecuniary benefit." *Skavysh v. Katsman (In re Katsman)*, 771 F.3d 1048, 1050 (7th Cir. 2014). Further, "materiality" is broadly construed for purposes of Section 727 to include any statement which bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. *Lardas v. Grcic*, 847 F.3d at 570 (quoting *Stamat*, 635 F.3d at 982). Section 727(a)(4) does not require the plaintiff to demonstrate a specific "dollar amount of mistake or omission." Even if this were not the law, as discussed above the Plaintiff has demonstrated by a preponderance of the evidence that the

Debtor understated in his filed schedules his monthly income by at least $5,900 and his wife's by at least $2,000, and understated his gross income for 2012 by at least $67,000. The fact that his actual income may very well have been even higher is no excuse, let alone a defense for these false statements.

For these reasons the Court finds that the Plaintiff met its burden for the entry of judgment in its favor on Count I of the Amended Complaint and, accordingly, shall deny the Debtor a discharge under Section 727(a)(4)(A).

*Section 727(a)(2).*

Section 727(a)(2) provides for denial of discharge where the debtor

> with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2). The Plaintiff alleges in Count IV that Dr. Hansen concealed and "fail[ed] to disclose certain assets ... in his Citation Answers and at the hearing on his Citation to Discover Assets" in the Lake County proceeding, including "his interest in the airplane hangar located at 6022 Cesna Drive, Rockford International Airport, and his interest in one 2011 Hyundai Elantra." At trial and in its post-trial brief, the Bank further elaborates that this concealment included the Debtor's gift to Carmen Hansen of jewelry worth more than $20,000 in August 2012, less than a year before the petition date.

To obtain relief under Section 727(a)(2), the complaining creditor need not "actually suffer harm," but must demonstrate "by a preponderance of the evidence

that the debtor actually intended to hinder, delay, or defraud a creditor, ... [and] intent to defraud must be actual and cannot be constructive." *In re Kempff*, 847 F.3d 444, 448 (7th Cir. 2017) (citation omitted).   The Plaintiff has met its burden.   The evidence shows that the Debtor concealed and transferred assets within the year preceding the filing of his petition with the intent of hindering creditors, which he further concealed post-petition by omitting them in his bankruptcy schedules.   With respect to this count the Plaintiff points to the pre-petition gift of jewelry and his concealment of his interest in the airplane hangar and Hyundai Elantra.   But as discussed above in the Court's analysis of Section 727(a)(4), the evidence also shows that the Debtor intentionally concealed income he received from his dental practices both during the year before and after filing the petition.   The Plaintiff also demonstrated that Dr. Hansen failed to disclose his interest in Hansen and Hansen DDS, Ltd. and Manatee Bay Restaurant, Inc., and in the assets titled in the names of these entities such as the Piper aircraft and Cadillac limousine, and the cash gifts made to his son.

In his response to the Plaintiff's motion for summary judgment, Dr. Hansen admitted that he intentionally concealed his income from creditors by causing it to flow through his companies' accounts:

> Debtor admits that after the creation of a Citation Lien on this personal account, thus freezing it, personal bills were paid from a business account. Generally speaking, business profits are the only source of income to pay any bills.

(Resp., ECF No. 120, ¶ 11.) This scheme, which included the gift of over $20,000 in jewelry to Carmen Hansen, occurred between the dismissal of the Debtor's failed

Chapter 11 case on June 16, 2011 and the commencement of his current Chapter 7 case on April 23, 2013. Even more notable is the Debtor's continued concealment of these assets and transfers by failing to disclose them in the bankruptcy schedules signed under penalty of perjury. The evidence clearly shows these omissions to be fraudulent concealments made by the Debtor with fraudulent intent.

In addition, the Plaintiff also points to incomplete responses the Debtor made in connection with a pre-petition state court citation proceeding. Where a debtor conceals property within a year before a bankruptcy petition by making false statements at a hearing on a state court citation to discover assets or by failing to disclose such property in documents required to be delivered or filed in connection with such proceeding, such concealment can furnish a basis to deny discharge under Section 727(a)(2)(A). *In re Marcus-Rehtmeyer*, 784 F.3d 430, 444 (7th Cir. 2015). But the record is not so clear regarding these statements to conclude that the Plaintiff has not satisfied its burden. Responding to the Plaintiff's summary judgment motion Dr. Hansen admitted that he failed to disclose either the airplane hangar or the Elantra in "response to the citations to discover assets and the attached riders." (Debtor Resp. to Local Rule 7056-1 Statement, ECF No. 117, ¶¶ 41–43.) The Plaintiff presented at trial, without objection, citation notice responses which the Debtor testified he completed, and which did not disclose his interest in the hangar or vehicle. (the "riders", Pl. Ex. 31; Tr. May 16, 2017, 158:12-160:17.) However, the testimony about the undated riders is unclear, including as to whether they were actually filed or presented in the citation proceeding, and there was no testimony as to whether

such a hearing was actually held or, if so, what was presented at it.[24]

In any event, this Court need not dwell on the omissions made in connection with the citation proceeding because the Plaintiff met its burden of proving intentional concealment of income, vehicles, companies, and intentionally fraudulent transfers of assets, including jewelry within the one-year pre-petition by a preponderance of the evidence. Judgment, accordingly, will be entered in favor of the Plaintiff on Count IV.

### B. The Plaintiff Failed to Meet its Burden of Proof on the Remaining Counts.

Although likely rendered moot by the Court's determination that the Debtor should be denied a discharge pursuant to Section 727(a)(4) and (a)(2), the Plaintiff failed to meet its burden with respect to the remaining counts.

*Section 727(a)(5) (Failure to Explain Loss of Assets).*

In Count II to the Amended Complaint, the Plaintiff alleges that the Debtor "failed to explain satisfactorily, the loss of assets including the fixtures, equipment and other property, which existed and were used in relation to debtor's business Manatee Bay Restaurant, Inc., and which were disclosed on debtor's Schedule B in his prior Chapter 11" case.

Under Section 727(a)(5), bankruptcy courts have "broad power to decline to grant a discharge ... where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996) (internal

---

[24] Indeed, Exhibit 31 actually includes two separate completed versions of the citation rider form. Another document included in Exhibit 31 but not shown to the witness at trial merely suggests that there may have been a hearing on an unspecified date and that the second rider may have been completed after the hearing.

citation omitted). To deny a discharge on this ground, the plaintiff bears the burden of proving the objection by a preponderance of the evidence. *In re Hudgens*, 149 Fed. Appx. 480, 487 (7th Cir. Aug. 26, 2005). The "creditor has the initial burden to establish that there has been a loss or disappearance of assets [after which] the burden shifts to the debtor to satisfactorily explain the loss of assets." *Id.* A "satisfactory explanation" of the loss of assets "must consist of more than ... vague, indefinite, and uncorroborated" assertions by the debtor. *D'Agnese*, 86 F.3d at 734. While documentary support for an explanation is preferred, there is "no bright line rule ... that a debtor must ... always present documentation whenever a creditor establishes a loss of assets." *Hudgens*, 149 Fed. Appx. at 488. As long as a debtor's "explanation convinces the judge that the debtor has not hidden or shielded assets, corroborating evidence by way of documentation is not necessary in every instance." *D.A.N. Joint Venture v. Cacioli* (*In re Cacioli*), 463 F.3d 229, (2nd Cir. 2006) (quoting *Krohn v. Cromer* (*In re Cromer*), 214 B.R. 86, 97 (Bankr. E.D.N.Y. 1997)).

The Plaintiff asserts in support of its Section 727(a)(5) count only that the Debtor failed to explain the loss of fixtures, equipment and other property which existed and were used in relation to the Debtor's business Manatee Bay Restaurant, Inc. But the Debtor not only explained, but the Parties have actually stipulated that the property "was the subject of a theft." (ECF No. 138, ¶ 26.) They further stipulated that a "police report was filed on December 21, 2011 reporting the theft of property from the Manatee Bay Restaurant [listing] Debtor's tenant, Patricia Baggott, as a suspect." The Debtor testified without contravention that he "first became aware that

there was an issue with the restaurant equipment" when he received a call from a Munroe County, Florida, sheriff. (Tr. May 16, 2017, 145:22-146:4.)  He further testified that he only periodically visited the Florida restaurant, visited it after the theft in January 2012 and could not recall how many times he had visited it in the eight months prior. (Tr. May 16, 2017, 145:9-19.)  The Plaintiff offered no proof that the Debtor was involved with the theft of the equipment or was personally aware of what happened to the equipment subsequently.

Additionally, the evidence shows that the police investigated the theft and that the Plaintiff was aware of the results of that investigation.  The Plaintiff's general counsel, Douglas Durkin, testified that he "went chasing the police report" after the Bank filed a claim on the Debtor's insurance policy for the loss. (Tr. June 1, 2017, 158:19-23.)  He obtained a copy of the police report in October 2012, after some delay because the police department "had an open investigation." (Tr. June 1, 2017, 158:14-159:3.)  The police report, the admission of which was not opposed, lists Patricia Baggott as a suspect. (Pl. Ex. 24.)  It describes the police department's investigation of the theft, including a summary of conversations with the Debtor and interviews with Patricia Baggott and an individual who was believed to have purchased at least some of the stolen equipment from Ms. Baggott.  According to the report, the Debtor told the officer that "at no time did he ever give Baggott permission either verbally or in writing, to sell any of the equipment, seating or any other items from the Manatee Bay Restaurant, and he does wish to press charges." (Pl. Ex. 24.)  While the officer's statements in the report are inadmissible to prove the truth asserted, the existence

of the report shows that the Bank was in fact given a detailed explanation of the loss of the restaurant equipment – one consistent with the Debtor's testimony.[25]

Indeed, the Bank's post-trial brief attempts to fault the Debtor for not taking steps to prevent the loss or to recover the property rather than attack the Debtor's explanation of the loss. It states that in a "situation that begs credulity, Dr. Hansen permitted an individual that he hardly knew to manage his restaurant business, leaving her in possession of valuable assets." (ECF No. 144.) In doing so, the Plaintiff therefore does not seem to dispute whether Ms. Baggott stole the equipment, but rather faults the Debtor for having trusted her in the first place. The Plaintiff's brief further complains that the Debtor did not take "any steps to locate the property, to get that property back, or recover the insurance proceeds." (*Id.*)

The Plaintiff does not dispute that a report was filed with the police, that the police investigated the matter and that both it and the Debtor were aware of an ongoing police investigation. More importantly, the Plaintiff does not establish how the Debtor's potential carelessness regarding his agreement with Ms. Baggott to manage the restaurant or the Debtor's action or inaction in attempting to recover the stolen property relates to the sufficiency of the Debtor's explanation regarding the missing equipment.

Section 727(a)(5) is not "concerned with the wisdom of [the] debtor's disposition of assets, but is concerned with the truth, detail and completeness of the debtor's

---

[25] It also is notable that to the extent the Debtor failed to personally provide information about the further disposition of the equipment, it is not disputed that those details pertained to actions that occurred after the equipment was stolen and no longer in his possession or control.

explanation of the loss." *Spirk v. Sullivan*, 2003 WL 22048077 (N.D. Ill. Aug. 28, 2003) (citing *In re D'Agnese*, 86 F.3d 732, 735 (7th Cir. 1996)). Accordingly, the Plaintiff has failed to meet its burden of demonstrating that the Debtor failed to explain satisfactorily a loss of assets. Judgment will therefore be entered in favor of the Debtor on Count II of the Amended Complaint.

### *Section 523(a)(6).*

In the alternative, Count III seeks to except the debt from the Debtor's discharge under Section 523(a)(6) "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Specifically, the Plaintiff alleges that the Debtor "did unlawfully remove and misappropriate, or did wrongfully allow other persons or entities to unlawfully remove and misappropriate" equipment at the Florida restaurant and "failed to name plaintiff as the loss payee for certain Manatee Bay Restaurant, Inc. property under" the Scottsdale Insurance policy. (Amended Compl., ECF No. 74, ¶¶ 8–11.) In connection with this the Plaintiff argued at trial that the Debtor "fail[ed] to take any steps to recover the collateral." (*See* Pl.'s Post-Trial Br., ECF No. 144)

A creditor seeking nondischargeability under § 523(a)(6) must demonstrate by a preponderance of the evidence "(1) an injury caused by the debtor (2) willfully and (3) maliciously." *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013). Injury is a "violation of another's legal right, for which the law provides a remedy." *Id.* Willfulness requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Gerard v. Gerard*, 780 F.3d 806, 811 (7th Cir.

2015) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)). Willfulness can be found "either if the debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury." *Id.* (internal quotation marks and citation omitted). Mere negligence is insufficient to show willfulness for purposes of Section 523(a)(6). *Id.* at 807 (finding jury verdict which "could have been based on [debtor's] negligence" did not have preclusive effect on issue of willfulness).

Maliciousness "requires that the debtor acted 'in conscious disregard of [his] duties or without just cause or excuse; it does not require ill-will or specific intent to do harm.'" *Horsfall*, 738 F.3d at 774 (7th Cir. 2013) (quoting *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994)). Even an intentional breach of contract "is not enough to support a claim under § 523(a)(6) unless the debtor's conduct also gives rise to an independent tort." *In re Pagan*, 564 B.R. 324, 326 (Bankr. N.D. Ill. 2017) (citing *Wish Acquisition, LLC v. Salvino (In re Salvino)*, 373 B.R. 578 (Bankr. N.D. Ill. 2007), *aff'd*, 2008 WL 182241 at *3-4 (N.D. Ill. 2008)). Conduct "is tortious for purposes of § 523(a)(6) if it constitutes a tort under state law." *Id.* (citing *Oakland Ridge Homeowners Assoc. v. Braverman (In re Braverman)*, 463 B.R. 115, 119 (Bankr. N.D. Ill. 2011)). For instance, in *Horsfall*, the Seventh Circuit concluded that of the three theories of recovery put forth in the state court complaint upon which the plaintiff sought to rely: "breach of contract, tortious interference, and unjust enrichment . . . only the intentional torts of interference and conversion could plausibly constitute willful and malicious injury." 738 F.3d at 773. Additionally, the Supreme Court has suggested that Section 523(a)(6) is limited to certain types of intentional torts, stating

that "§ 523(a)(6)'s formulation triggers in the lawyer's mind the category 'intentional torts,' which generally require that the actor intend the *consequences* of an act, not simply the act itself." *Kawaauhau v. Geiger*, 523 U.S. at 58. *See also Horsfall*, 738 F.3d at 774 ("Although *Geiger* refers to intentional torts to help explain the federal standard, it does not hold that all state-law intentional torts are 'willful' for purposes of section 523(a)(6).").

Here, as a factual matter, the Plaintiff has failed to demonstrate by the preponderance of the evidence that the Debtor himself stole any of the missing restaurant equipment or authorized Ms. Baggott or anyone else to misappropriate the equipment. As for the allegation that the Debtor could have but failed to take steps to prevent such theft, or that he failed to obtain the proper type of insurance to cover such loss, the Plaintiff has failed to demonstrate that such inaction constitutes an intentional tort under state law. Even if he was required to take steps under one of the mortgage or loan agreements with the Plaintiff and even if his failure to do so constituted a breach of contract, that alone would not except his indebtedness from discharge under Section 523(a)(6).

Accordingly, judgment will be entered in favor of the Debtor on Count III.

*Section 523(a)(2)(B).*

Finally, Count V seeks to except the debt from discharge under Section 523(a)(2)(B), alleging that the Debtor failed to disclose in his original loan applications to Eastern Savings Bank his interest in the airplane, the airplane hangar and the Cadillac limousine. (Amended Compl., ECF No. 74, ¶ 15.) In its Post-

Trial Brief, the Plaintiff argues that by "failing to disclose these assets, Dr. Hansen defrauded Eastern from additional collateral they could have placed a lien upon." (Pl.'s Post-Trial Br.)

Section 523(a)(2)(B) excepts from discharge a debt

> "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... use of a statement in writing-- (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive."

11 U.S.C. § 523(a)(2)(B). The creditor bears the burden of proving each element by a preponderance of the evidence. *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010). It must prove not only that it actually relied on the false statement but "that its reliance was reasonable in order for a debt to be excepted from discharge under § 523(a)(2)(B)." *In re Hudgens*, 149 Fed. Appx. 480, 484–85 (7th Cir. Aug. 26, 2005). The "concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors." *In re Morris*, 223 F.3d 548, 554 (7th Cir. 2000) (quoting *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993)). But in making a determination of reasonableness, a "bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the

inaccuracy of the debtor's representations." *Id.*

Here, the Court finds that the Plaintiff failed to demonstrate that it actually relied on the omission implying that the Debtor did *not* own the 1970 Piper aircraft, interest in the hangar or the 1990 Cadillac limousine. The two written financial statements that the Plaintiff received from the Debtor prior to extending the loans[26] were "prepared for the bank's purposes to have the borrowers sign and restate as of the date of the closing the loan terms," according to the testimony of the Bank's general counsel, and not for the purpose of deciding whether or not to lend the money. (Tr. June 1, 2017, 55:19-56:2.)

Even if the earlier loan applications contained in Exhibit 21 had been provided to the Bank prior to its decision to make the loan, the Plaintiff has not demonstrated that it relied on any false information. The only falsities that the Plaintiff identified are the failure to list as assets the plane, the hangar and the Cadillac. But, while it is readily understandable that a lender might rely on representations about what assets a borrower owns in making its lending decision, Plaintiff cannot explain why here it would rely on representations about what assets the borrower did *not* own. The Plaintiff has not suggested, for example, that it was lending under some form of public interest loan with maximum net worth limitations to qualify. Nor has the Plaintiff suggested that it was concerned about the airplane being dangerous to the borrower or a potential source of liability. Instead, the Plaintiff only suggests that it might have requested a lien in the additional property had it known about them. But

---

[26] Those contained in the two loan applications dated April 21, 2006, the same day as the loans.

there is nothing in the record to suggest that the Debtor would be granted a security interest in such property. And the fact remains that the Bank was willing to lend the money based on the collateral it received. Indeed, the Plaintiff's general counsel testified that based on the information Eastern Savings Bank had received, "we thought there was more than sufficient value for that loan." (Tr. June 1, 2017, 180:11-16.)

The Plaintiff has failed to demonstrate that it reasonably relied on materially false statements made by the Debtor in writing. Accordingly, judgment will be entered in favor of the Debtor on Count V.

### CONCLUSION

For the foregoing reasons, judgment will be entered in favor of the Plaintiff on Counts I and IV and in favor of the Debtor on Counts II, III and V. A separate order shall be entered giving effect to the determinations reached herein.

DATE: March 28, 2018          ENTER:

_____
Thomas M. Lynch
United States Bankruptcy Judge